The CITIZENS AND SOUTHERN NATIONAL BANK OF SOUTH CAROLINA, as Committee for Harry J. Tumbleston, Jr., Appellee,

v.

DICKERSON, INC., Appellant.

No. 10523.

United States Court of Appeals Fourth Circuit.

Argued June 23, 1966.

Decided Dec. 27, 1966.

Charles H. Gibbs, Charleston, S. C. (H. Fletcher Padget, Columbia, S. C., Sinkler, Gibbs & Simons, Charleston, S. C., and Turner, Padget, Graham & Laney, Columbia, S. C., on brief), for appellant.

Ernest F. Hollings, Charleston, S. C. (Falcon B. Hawkins, and Hollings & Hawkins, Charleston, S. C., on brief), for appellee.

Before BOREMAN and BRYAN, Circuit Judges, and LEWIS, District Judge.

OREN R. LEWIS, District Judge:

The plaintiff was seriously injured when the automobile in which he was a passenger came in contact with a portion of the temporary guardrail the defendant had erected along the western edge of the Sammy Swamp Bridge.

The jury brought in a verdict in his favor in the amount of $260,000.00 actual and $5,000.00 punitive damages. Counsel for the defendant timely moved for judgment notwithstanding the verdict and, in the alternative, for a new trial.[1] The District Court denied the motions. This appeal followed.

We have carefully examined the transcript in this case and are satisfied there was ample evidence to submit the case to the jury.

We affirm the District Court's denial of the defendant's motions for judgment notwithstanding the verdict and for a new trial. We find no merit in the defendant's other challenges to the District Court's rulings.

The Sammy Swamp Bridge was then being widened by the defendant construction company under contract with the South Carolina State Highway Department. The widening work was conducted so that only half of the bridge was under repair at one time. The eastern half involving northbound traffic was completed first. The western half involving southbound traffic was being widened at the time of this accident. This required the removal of an upright concrete abutment and a portion of the old roadway, resulting in a narrowing of the original 12-foot southbound traffic lane to something around 7½ feet. The completed northbound lane was 22 feet, 4 inches in width.

The contractor (defendant) warned the traveling public of this unusual and dangerous condition of the roadway by placing some 19 caution signs and warning devices on both the north and south approaches to the bridge area and by erecting a temporary guardrail along the western edge of the narrowed southbound traffic lane. The guardrail was made with boards of varying sizes, some plain, some painted black and white, nailed to two-by-four posts set on two-by-six-inch wooden plates which were nailed to the asphalt near the edge of the roadway. Various witnesses described the guardrail as extremely "flimsy"—"shabby"—"sagging"—"scanty"—"just stacked up"—one witness said the rail "zigzagged"—photographs corroborate these descriptions. The defendant knew the guardrail had been knocked or blown over into the swamp by passing automobiles on previous occasions. Its employees would retrieve the pieces and put them back on the edge of the roadway.

When the railing was first erected the defendant placed four truck flashing lights on the top rail. They were soon knocked or blown off by passing trucks. The foreman then removed the lights to a barricade near the approach to the bridge. There were no flambeau or flashing lights on the temporary guardrail or painted lines marking the western edge of the narrowed southbound traffic lane on the night of the accident.

The accident occurred on a dark night at approximately 10:50 p. m. The Greenhills and the Tumblestons were returning home from North Carolina in the Greenhill automobile. Mrs. Greenhill was driving, Mrs. Tumbleston was in the right front seat, Mr. Greenhill in the right-hand rear seat and Mr. Tumbleston in the left-hand rear seat. Mrs. Greenhill saw the numerous warning signs as she approached the bridge area. She dropped her speed to about 20 miles per hour and proceeded across the bridge. Just as she got on the bridge a speeding truck approaching from the south rounded the curve with its bright lights on. Mrs. Greenhill dimmed her lights and looked down at the road—she followed the white line and did not deviate, swerve or move her course of travel. When she got about

1. It is well settled that in reviewing the ruling of a trial court on motion for judgment notwithstanding the verdict, the standards required by that motion are the same as those required by a motion for a directed verdict. Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147. Our review is limited to a determination of whether the evidence warrants submission of the case to the jury, Appleman v. United States, 338 F.2d 729 (7 Cir. 1964) and we must view the evidence in the light most favorable to the plaintiff. Perkins v. Henry J. Kaiser Construction Company, 236 F.Supp. 484 (W.Va., 1964).

midway across the bridge a board struck the front end of her automobile and one came through the windshield, hitting Mr. Tumbleston in the face. Mrs. Greenhill continued on across the bridge and stopped just before getting to the curve because she felt trapped and wanted to get off the bridge. She testified that whatever she ran into had to be sticking out in front of her but she did not see it before the accident.

The board that came through the windshield and pierced Mr. Tumbleston's head was identified as being part of the temporary guardrail.

The point of impact was near the middle of the bridge, involving a 15- to 25-foot section of the guardrail. The northern end of the guardrail remained erect —the railing up to the middle of the bridge was undisturbed.

The defendant admits that it did create at this site on the highway an unusual situation which could be dangerous and might cause damage or injury to persons not aware of the unusual or dangerous situation and that it had the duty of maintaining signs warning the traveling public of the dangerous condition thus created. This duty, the defendant says, was fully met by the erection and maintenance of more than 22 warning signs, including the guardrail.

Counsel for the defendant claim this case should not have been submitted to the jury.[2] They say there was no proof of what caused this accident except Mrs. Greenhill's sole negligence in running into the guardrail which she saw and of which she was adequately warned. They further say there was no proof that the board Mrs. Greenhill hit was sticking out into the roadway, absent speculation and conjecture on the part of the jury.

We disagree. The guardrail was made from random size boards. One witness, Davis, said some of the boards would stick out in the road. Others described the guardrail as "sagging," "flimsy"— one said it "zigzagged." There was evi-

dence the guardrail had been previously knocked or blown into the swamp by passing automobiles. The board that came through the windshield and hit the plaintiff was from the guardrail. The bridge was dark. Neither the guardrail nor western edge of the roadway was lighted or delineated at the time of the accident. The southbound traffic lane was narrowed to approximately 7½ feet. The northbound lane was more than 22 feet wide. Mrs. Greenhill was partially blinded by the bright headlights of an approaching truck. The northern half of the bridge railing was untouched. There was some evidence that Mrs. Greenhill collided with the northern end of the barricade.

■ Although the defendant was not an insurer of the safety of the travelers using the bridge in question, it had the duty of keeping the highway in reasonably safe condition for travel and to erect and maintain sufficient signs, guardrails and warnings as may enable the users of the highway, exercising ordinary care and prudence, to avoid injury to themselves and others (see Cooper v. South Carolina State Highway Department, 183 S.C. 155, 190 S.E. 499), and if the defendant failed to do so it was guilty of negligence.

■ Of course the plaintiff must prove more than negligence to justify an award of damages. He must prove that the negligent, willful or reckless act relied upon was the proximate cause of his injury. The defendant's negligence, however, need not be the sole cause of his injury. It is sufficient that the defendant's negligence concurring with one or more efficient causes, other than the plaintiff's fault, is the proximate cause of his injuries. See 65 C.J.S. Negligence § 110.

" * * * negligence cannot be established by direct, precise evidence such as can be used to show that a piece of ground is or is not an acre. Surveyors can measure an acre. But

2. The defendant made a motion for a directed verdict at the close of the plain-tiff's case and at the close of all the evidence.

measuring negligence is different. * * * 'The very essence of its [jury] function is to select from among conflicting inferences and conclusions that which it considers most reasonable.' Fact finding does not require mathematical certainty. Jurors are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn." Schulz, etc. v. Pennsylvania Railroad Co., 350 U.S. 523, 76 S.Ct. 608, 100 L.Ed. 668 (1956).

"Proof of negligence may rest entirely on circumstances, and circumstantial evidence alone may authorize a finding of negligence." Childers v. Gas Lines, Inc., 149 S.E.2d 761 (S.C.1966).

■ So viewed, it is reasonably inferable from the evidence in this case that the dangerous condition created and left unlighted at the bridge site by the defendant would probably cause injury to something or someone. It is our opinion that the question of liability—negligence, proximate cause and damages—was properly submitted to the jury.

### EXCESSIVE VERDICT

■ Prior to his injury the plaintiff was a 24-year-old skilled crane and heavy equipment operator earning $165.00 per week, with a life expectancy of 47 years. His disfigured face is grotesque. He lost an eye and suffered other permanent injuries as a result of organic brain damage. Someone has to attend him constantly. He cannot operate a crane or drive an automobile and cannot be retrained. His ability to care for his wife and four children has been materially impaired. Upon this evidence we cannot say the jury's verdict is excessive.

### IMPUTED NEGLIGENCE

The latest South Carolina case, Spradley v. Houser, 146 S.E.2d 621 (February 1966), holds

" * * * that in order to constitute a joint enterprise, so that negligence of one may be imputed to another, there must be a common purpose and a community of interest in the object of the enterprise and an equal right to direct and control the conduct of each other with respect thereto."

The Greenhills were going to the rodeo to see about getting some bucking horses and bulls for their rodeo. They invited the Tumblestons to go along. They paid all expenses of the car. The Tumblestons paid for the meals. Plaintiff exercised no control of the movement of the car. He was asleep in the back seat at the time of the collision.

■ The negligence, if any, of the driver of the car in this case was not imputable to the passenger. The District Court was correct in refusing to submit this question to the jury.

### PUNITIVE DAMAGES

" * * * a plaintiff [who] proves a willful, wanton, or reckless violation of his rights * * * is entitled to an award of punitive damages." Kushner v. Legette, 330 F.2d 447 (4th Cir. 1964).

■ The evidence of willful and reckless misconduct on the part of the defendant in this case includes construction, erection and maintenance of the temporary guardrail;—narrowing of the southbound traffic lane and location of the center line on the bridge;—removal of flambeau and flashing lights from the guardrail;—and failure to make daily inspection of the condition of the bridge. This assignment of error is without merit.

### ADMISSIBILITY

■ Sanders worked for the defendant on the Sammy Swamp Bridge job until the job closed down temporarily some three weeks prior to the accident. He helped in narrowing the southbound traffic lane and in building the temporary guardrail. He testified about finding the railing in the creek on some mornings and about the lights getting knocked off the railing by passing trucks and the foreman telling him he was not going to

get any more [lights]. This witness testified no lights were on the guardrail when the job closed down on August 6th.

The defendant moved to strike this testimony on the grounds of irrelevancy and remoteness. No authority was cited in support of the motion. Rule 43(a), F.R.Civ.P., puts admissibility on the basis of relevancy and materiality. The cast of subdivision (a) is toward admissibility, not exclusion. See Moore's Federal Practice, Vol. 5, p. 1319. Sanders' testimony had probative value and was clearly admissible.

Affirmed.